IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

        v.                                                    18-CR-3494 JB-LF-1

DEREK JAMES,

    Defendant.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

THIS MATTER comes before me on defendant Derek James' Motion to Suppress Tangible Evidence and Statements, filed on February 25, 2019. Doc. 16. The United States opposes the motion and filed its response on March 8, 2019. Doc. 20. The Court held an evidentiary hearing on April 12, 2019. Doc. 28.

The Honorable District Judge James O. Browning referred the motion to me to conduct hearings, if warranted, including evidentiary hearings, and to perform any legal analysis required to recommend to the District Court an ultimate disposition pursuant to the provisions of 28 U.S.C. § 636(b). Doc. 22. Having read the motion and response, and having heard the evidence presented on April 12, 2019, I recommend that the Court GRANT the motion.

I.    **Statement of Facts**

On February 6, 2017, Farmington Police Officer Navid Babadi was on patrol. Tr. 5:25−7:22.[1] According to Officer Babadi, he saw defendant Derek James drive by him sometime between 11:00 and 11:30 p.m. Tr. 8:2−17, 10:19−22, 28:11–29:1. Officer Babadi

---

[1] "Tr." refers to the transcript of the hearing on April 12, 2019. The number preceding the colon is the page number, and the number following the colon is the line number.

recognized Mr. James from prior encounters. Tr. 8:16−17. Officer Babadi checked the license plate and the driver's license status of Mr. James on the mobile system inside his patrol unit, and the system indicated that Mr. James' license was suspended. Tr. 8:18−21, 9:14−10:4, 40:2–41:5, 42:4–24.[2] Officer Babadi then engaged his emergency equipment and stopped Mr. James. Tr. 8:22−24, 10:5−14. Once he engaged his emergency equipment, Officer Babadi's dash camera automatically recorded the events from approximately one minute before he turned on the equipment until Mr. James pulled over, and that video recording was admitted into evidence as Defendant's Exhibit C. Tr. 31:1–15, 32:21–22, 33:16–21.

Mr. James pulled into a parking lot at San Juan and Scott. Tr. 10:12–14; 64:12–65:3; Def. Exh. C (showing that Mr. James pulled off the road into some sort of parking area). Before Mr. James stopped, Officer Babadi saw him moving around inside his car, which Officer Babadi described as a "furtive movement." Tr. 10:14–18, 13:8–14, 65:4–16. Officer Babadi thought that Mr. James might be hiding something. Tr. 65:17–66:11. Officer Babadi got out of his patrol unit and told Mr. James from the driver's side window that he pulled Mr. James over for a

---

[2] There was a lot of discussion at the hearing about whether Defendant's Exhibit B was a record of Officer Babadi running checks on Mr. James license plate on the mobile unit inside his patrol car. Officer Babadi believed that there was a record of the inquiries, but he had not seen the record, and he did not know whether Defendant's Exhibit B was this record. *See* Tr. 46:11–49:1. Because the time stamp on the video of Officer Babadi's conversation with dispatch after the stop was almost identical to the first time that Officer Babadi checked Mr. James' license plate (according to Defendant's Exhibit B), Mr. James suggested that Officer Babadi did not check the status of Mr. James' license until after he stopped Mr. James. *See* Tr. 48:20–52:13. Officer Babadi had no explanation for this other than to say that the lapel camera and the mobile computer system in his patrol unit are different systems, and they wouldn't necessarily show the same time. Tr. 51:20–52:13. Officer Babadi insisted that he ran Mr. James' license plate before he stopped Mr. James, Tr. 51:25, and his statement to Mr. James when he first approached him that he stopped him for a suspended license supports that testimony. *See* Tr. 11:16–18; Def. Exh. D 23:28. At the conclusion of the hearing, Sergeant Travis Spruell with the Farmington Police Department confirmed that Defendant's Exhibit B was a record of Officer Babadi's queries on Mr. James' license plate from the mobile system in his patrol car. Tr. 113:16–115:12.

2

suspended license.  Tr. 11:14–18; Def. Exh. C; Def. Exh. D 23:28.[3]  Officer Babadi asked Mr. James for his driver's license, registration and insurance, and Mr. James handed him a state ID card and his registration, but could not find his proof of insurance.  Tr. 54:8–12; Def. Exh. D 23:28−23:29.  After a short conversation, Officer Babadi went back to his patrol unit to check with dispatch to confirm that Mr. James' license was suspended.  Tr. 11:19–12:7; Def. Exh. D 23:28−23:32.

Officer Babadi checked with dispatch because he wanted to confirm that Mr. James' license was suspended, and he also wanted to know if there were any warrants out for Mr. James' arrest originating in any other jurisdiction.  Tr. 12:5–19.  The dispatch operator confirmed that Mr. James' license was invalid, but she did not use the word suspended.  Tr. 58:22–60:9.  The dispatch operator said the license was "invalid-expired" although the expiration date she gave was a date in the future.  Tr. 60:8–15.  Officer Babadi insisted, however, that the license was invalid.  Tr. 60:16–62:18.

Officer Babadi asked the dispatch operator to send a backup officer.  Tr. 13:5−7.  The backup officer, Sergeant Lacy, arrived before Officer Babadi went back to talk to Mr. James.  Tr. 13:5–10; Def. Exh. D 23:35.  When Sergeant Lacy arrived, Officer Babadi told him (out of Mr. James' earshot) that Mr. James' license was suspended and that he didn't have insurance, but that as soon as Officer Babadi pulled him over, "he like stuffed something under the seat."  Def. Exh. D 23:35.  Officer Babadi also said, "I've dealt with him before.  I know he's Code 12."  Def. Exh. D 23:35.  "Code 12" meant that Officer Babadi thought that Mr. James was involved in narcotics activity.  Tr. 67:14–68:12.  Officer Babadi also told Sergeant Lacy, "I'm gonna see if

---

[3] Defendant's Exhibit D is the audio and video recording from Officer Babadi's lapel camera. The time notation is from the lower right-hand corner of the video.  The number before the colon is the hour (in military time), and the number after the colon is the minute.

3

he's gonna give me consent to search the vehicle."[4] Def. Exh. D 23:35. He then said, "If not, I'm gonna . . . uh . . . gonna tow it just due to his suspension . . . ."[5] Def. Exh. D 23:35−23:36.

After his conversation with Sergeant Lacy, Officer Babadi went back to Mr. James and asked him to step out of his car so that he could ask him about the "furtive movement" he saw just before the stop. Tr. 13:8–10. Mr. James said he had just been reaching for his wallet. Tr. 13:11–14. When Mr. James got out of his car, Officer Babadi asked him if he had any illegal items on him and whether he could search his person. Tr. 13:21–14:5. Mr. James consented to a search of his person, and Officer Babadi did not find anything illegal on him. Tr. 13:24–14:5. Mr. James refused, however, to let Officer Babadi search his car. Tr. 71:16–18; Def. Exh. D 23:38, 23:40. At that point, Officer Babadi again went to talk to Sergeant Lacy out of Mr. James' hearing. Def. Exh. D 23:41. Officer Babadi told Sergeant Lacy, "I'm just gonna tow it due to his suspension and no insurance, and go from there." *Id.*

Officer Babadi testified that he decided to tow Mr. James' car based on "department policy and procedures." Tr. 14:9–10. He testified that Farmington Police Department ("FPD") policies allow police officers to tow vehicles if "there's an arrest incident or if there's lack of a licensed driver, suspended driver, or no insurance, registrations. If the car hasn't been registered, I believe it's for one year." Tr. 14:15–18. The policies themselves state, in pertinent part:

> An officer may consider towing a vehicle under any of the following circumstances:
> \* \* \* \*

---

[4] The discussion of Officer Babadi's conversations with Sergeant Lacy at the hearing was slightly different and a little confusing. *See* Tr. 66:15−72:25. I relied on the video of the encounter to determine what was said and in what sequence. *See* Def. Exh. D 23:35−23:36, 23:41.

[5] I could not discern what Officer Babadi said at the end of this sentence despite playing Defendant's Exhibit D multiple times.

4

3. Whenever the operator of the vehicle is found to have suspended or revoked driving privileges and there exists no properly licensed driver, designated by the owner of the vehicle, readily available to drive the vehicle.

Doc. 20-1 at 3. The policies further provide:

An officer may consider alternative methods of releasing the vehicle to the licensed owner, other than removing of a vehicle by towing, under situations wherein the volume of calls for service, roadway conditions, or other circumstances or factors allow for an officer to research alternative methods. An officer may not release a vehicle to a person who has consumed alcohol or who is suspected of otherwise being impaired.

Doc. 20-1 at 3.

Officer Babadi decided to tow Mr. James' car "[b]ecause of the insurance and no license." Tr. 15:1–4. Although Officer Babadi acknowledged that he "could have not towed the vehicle," he did not seem to think that this was a feasible option because there was not another driver present to take the vehicle. Tr. 73:7–74:8. Officer Babadi did not explore any alternatives to towing Mr. James' car even though Mr. James had a cell phone on him and conceivably could have called someone to come get his car. Tr. 75:22–76:19.

Officer Babadi told Mr. James that he was free to go, but that he was going to tow the car. Tr. 15:5–13; Def. Exh. D 23:41. Mr. James objected, but ultimately acquiesced and walked away. Def. Exh. D 23:41−23:47. Officer Babadi then started to do the tow inventory of Mr. James' car. Tr. 15:14–17; Def. Exh. D 23:48. Officer Babadi testified that he usually started inventory searches at the driver's side because "that's where most people put their valuables, in the center console or driver door pocket or around the driver." Tr. 79:2–80:3. During this initial "inventory,"[6] Officer Babadi found a white baggie with a white substance in it along with a cut straw. Tr. 15:23–16:7. Officer Babadi suspected that the white substance was an illegal

---

[6] During the initial inventory, Officer Babadi did not write down or call out the name of any of the items he was finding. Tr. 77:17–78:6.

narcotic, and that the cut straw was drug paraphernalia. Tr. 15:25–16:7. Because Mr. James was still within sight, Officer Babadi caught up with Mr. James and detained him for further investigation. Tr. 16:10–16, 88:12–90:7. When Officer Babadi returned to Mr. James' car, he continued his search and found a firearm underneath the driver's seat.[7] Tr. 16:19–24. The firearm was a Hi-Point handgun with a magazine attached. Tr. 16:25–17:24.

Shortly after Officer Babadi found the handgun, he advised Mr. James of his *Miranda* rights, which Mr. James appeared to understand. Tr. 18:1–5, 18:14–19:25, 91:5–23. Officer Babadi then questioned Mr. James about the handgun and the white substance he had found inside the vehicle. Tr. 18:6–7. Mr. James told Officer Babadi that the white substance belonged to his roommate (who had died recently), but he denied knowing that the gun was in his car although he said it also belonged to his deceased roommate. Tr. 18:8–12; Def. Exh. D 00:00−00:02, 00:09. Mr. James also admitted that he was a felon. Tr. 20:5–6; Def. Exh. D 00:00. Officer Babadi arrested Mr. James for being a felon in possession of a firearm. Tr. 20:1–9. Officer Babadi also field tested the white substance, and it tested presumptively positive for cocaine. Tr. 20:10–21:4. As a result, Officer Babadi also charged Mr. James with possession of a controlled substance. Tr. 21:5–8. Ultimately, however, forensic testing of the white substance indicated that it was not a controlled substance. Tr. 21:19–24.

After Officer Babadi arrested Mr. James, he completed the inventory search of Mr. James' car. *See* Tr. 80:22–82:25. During this final search, Officer Babadi called out the items inside the vehicle to a community service officer who had arrived at the scene to assist with the

---

[7] During this second search, Officer Babadi again did not write down or call out the name of any of the items he was finding. Tr. 78:11–23. Officer Babadi explained that he could "always go back and put in miscellaneous documents, clothes, and put what's on the inside of the vehicle." Tr. 78:21–23.

6

inventory search and tow. *See* Tr. 80:25–83:11, 84:21–86:23. At some point before the tow truck arrived, the community service officer filled out the vehicle tow form that listed the items in Mr. James' vehicle. *See* Tr. 93:23–95:14; Gov. Exh. 2.

## II. Discussion

Mr. James argues that Officer Babadi's traffic stop of him was unlawful, and that the Court should suppress all the evidence Officer Babadi obtained as a result of the stop. Doc. 16 at 7–8. He also argues that even if the stop was lawful, Officer Babadi "exploited the doctrine of inventory searches to accomplish a purely investigatory search." *Id.* at 8–11. Mr. James' final argument is that the *Miranda* warnings that Officer Babadi gave to Mr. James before questioning him were inadequate, and that therefore the Court must suppress the statements Mr. James made to Officer Babadi after those warnings. *Id.* at 11–13. The government contends that Officer Babadi lawfully stopped Mr. James, that he conducted a proper inventory search of his vehicle, and that he properly advised Mr. James of his *Miranda* rights before questioning him. Doc. 20 at 4–14. For the following reasons, I agree that Officer Babadi had reasonable suspicion to stop Mr. James, but I find that Officer Babadi decided to tow Mr. James' vehicle and conduct an inventory search for investigatory reasons rather than pursuant to the Farmington Police Department's tow policy. Thus, I recommend that the Court suppress the evidence found inside Mr. James' car. And although I find that Officer Babadi properly advised Mr. James of his *Miranda* rights, the Court should suppress the statements Mr. James made after he was advised of his rights because they were the fruit of the illegal search and seizure.

### A. <u>The Traffic Stop was Valid</u>.

There is no dispute that a traffic stop is a seizure within the meaning of the Fourth Amendment. *Brendlin v. California*, 551 U.S. 249, 255 (2007). A police officer may stop a

motorist if the officer has "articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law." *Delaware v. Prouse*, 440 U.S. 648, 663 (1979). Whether the police officer has any other motivation for stopping the vehicle or its driver is irrelevant. *See United States v. Cervine*, 347 F.3d 865, 870 (10th Cir. 2003); *see also Whren v. United States*, 517 U.S. 806, 813 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.").

In this case, Officer Babadi testified that when he saw Mr. James drive by him, he ran Mr. James' license plate through the mobile system in his patrol unit, and the results showed that Mr. James' driver's license was suspended. This information provided Officer Babadi with reasonable suspicion that Mr. James was driving the vehicle without a valid driver's license, which was sufficient to justify the stop. The stop itself did not violate the Fourth Amendment.

Mr. James argues that Officer Babadi actually pulled Mr. James over based only on a hunch that he had drugs on him, based on Officer Babadi's previous encounters with him. Doc. 16 at 7. He says that although Officer Babadi may have conducted a license plate check on him before he stopped him, that check did not produce any incriminating information, and he refers to Defendant's Exhibit A. *Id.* at 7−8. The evidence introduced at the hearing, however, does not support Mr. James' contentions.

As already mentioned, Officer Babadi was very clear in his testimony that he ran the check and saw that Mr. James' license was suspended prior to stopping him. Furthermore, Officer Babadi's dash camera and lapel camera show that immediately upon approaching Mr. James, Officer Babadi told Mr. James that he stopped him for driving with a suspended license. Def. Exh. C; Def. Exh. D 23:28. Thus, the cameras corroborate Officer Babadi's testimony.

And although Mr. James suggested at the hearing that because the printout of Officer Babadi's inquiries on his mobile system—Defendant's Exhibit B—showed that the inquiry was after the stop, not before, Officer Babadi explained that the timestamps on Exhibit B and on his lapel camera could be different because they are different systems. In addition, the second time stamp on Defendant's Exhibit B is 23:38:50. At 23:38 on the lapel camera (Def. Exh. D), Officer Babadi was patting Mr. James down and definitely was not conducting an inquiry on the mobile unit inside his patrol car, demonstrating that the time stamps on the two systems were not in sync. *Compare* Def. Exh. B *with* Def. Exh. D 23:38. Finally, although Mr. James points to his Exhibit A as showing that the inquiry performed by Mr. Babadi did not produce any incriminating evidence, there was no discussion at the hearing as to what Exhibit A was. In fact, the testimony at the hearing established that it was impossible to obtain a printout or recreate what information Officer Babadi received by running Mr. James' license plate through his mobile system on February 6, 2017. *See* Tr. 109:11−112:8, 116:9−117:1. Thus, I credit the testimony of Officer Babadi and find that he had obtained credible information before he stopped Mr. James that Mr. James' driver's license had been suspended. The stop was therefore lawful.

    B.    <u>The Impoundment and Subsequent Inventory Search of Mr. James' Vehicle were Unlawful</u>.

The government bears the burden of proving that the impoundment of a vehicle and any subsequent inventory search of that vehicle is reasonable under the Fourth Amendment. *United States v. Sanders*, 796 F.3d 1241, 1244 (10th Cir. 2015); *United States v. Taylor*, 592 F.3d 1104, 1107 (10th Cir. 2010). "[I]mpoundment of a vehicle located on private property that is neither obstructing traffic nor creating an imminent threat to public safety is constitutional only if justified by both a standardized policy and a reasonable, non-pretextual community-caretaking rationale." *Sanders*, 796 F.3d at 1248. Similarly, "[g]ranting police discretion over whether to

impound and inventory a vehicle is permissible so long as officers exercise that discretion according to standardized criteria, and not 'in bad faith or for the sole purpose of investigation.'" *Taylor*, 592 F.3d at 1108 (quoting and citing to *Colorado v. Bertine*, 479 U.S. 367, 372, 374−75 (1987)). In other words, unlike most areas of Fourth Amendment law, the actual motivation of the police officer in deciding to impound a vehicle and in conducting an inventory search of that vehicle is crucial.

In determining whether an impoundment is reasonable and supported by a legitimate, non-pretextual community-caretaking rationale, the Tenth Circuit has directed courts to consider the following, non-exhaustive list of factors: "whether the vehicle is on public or private property; (2) if on private property, whether the property owner has been consulted; (3) whether an alternative to impoundment exists (especially another person capable of driving the vehicle); (4) whether the vehicle is implicated in a crime; and (5) whether the vehicle's owner and/or driver have consented to the impoundment." *Sanders*, 796 F.3d at 1250. If the Court determines that the decision to impound the vehicle was lawful, it then must determine whether the subsequent inventory search of the vehicle was lawful. *See id.* at 1244 n.1 (noting that "[t]hough impoundments and inventory searches often occur sequentially, they are subject to different legal standards"). An inventory search is lawful if "conducted according to standardized procedures." *United States v. Haro-Salcedo*, 107 F.3d 769, 772 (10th Cir. 1997). It cannot "be a ruse for a general rummaging in order to discover incriminating evidence." *Id.* at 772−73.

The first issue with respect to whether Officer Babadi's decision to impound the vehicle was lawful is whether standardized criteria guided his decision. *See Sanders*, 796 F.3d at 1248−49. Officer Babadi testified that he decided to tow Mr. James' car because Mr. James did not have a valid license or proof of insurance. Tr. 12:15−20, 15:1−4. The FPD's policies permit

10

an officer to tow a car if "the operator of the vehicle is found to have suspended or revoked driving privileges *and* there exists no properly licensed driver, designated by the owner of the vehicle, readily available to drive the vehicle." Doc. 20-1 at 3 (emphasis added). There is no policy, however, that permits an officer to tow a vehicle if the operator of the vehicle does not have proof of insurance. *See id.* at 3−4. Thus, the question is whether the circumstances satisfied the first criteria—no valid license and no properly licensed alternative driver designated by the owner who was "readily available."

Officer Babadi admitted that he made no effort to determine whether another driver was "readily available." *See* Tr. 73:7−74:8, 75:22−76:19. Officer Babadi seemed to assume that because no one else was present, no other driver was "readily available." *See* Tr. 73:7−74:8. But "readily available" is not synonymous with "present." "Readily available" means available without delay or difficulty. Officer Babadi knew Mr. James was from the Farmington area because he recognized him from prior encounters. Further, Mr. James told Officer Babadi that he was going to pick up his girlfriend from a local hotel. Def. Exh. D 23:37, 23:41. Officer Babadi's failure to even inquire as to whether Mr. James could designate a properly licensed driver who was "readily available" to come pick up his car demonstrates that the decision to tow the vehicle was not made according to FPD's standardized procedures.

Furthermore, examination of the factors relevant to "whether an impoundment is justified by a reasonable and legitimate, non-pretextual community caretaking rationale" weigh in favor of a finding that the decision to tow Mr. James' car was a pretext for obtaining access to the car to search it. *See Sanders*, 796 F.3d at 1250. First, although it is unclear whether Mr. James' car was parked on public or private property, there is no question that he was parked in a parking lot and was not blocking the street, traffic, or the sidewalk. Tr. 64:12−65:2; Def. Exh. C. Second,

there was no evidence that Officer Babadi consulted with anyone associated with the parking lot to determine whether Mr. James could leave his car parked in the lot until a properly licensed driver could come pick it up. It was after 11:00 p.m. when this encounter took place, and it appeared from the video that Mr. James pulled into an empty parking lot associated with a business that appeared to be closed, although the lights were on inside the business. *See* Def. Exh. C. The area was not deserted; both cars and pedestrians passed by while the encounter took place. *See* Def. Exhs. C, D. Third, and as already noted, Officer Babadi made no effort to determine whether there was an alternative to towing Mr. James' car. Officer Babadi did not arrest Mr. James before he decided to tow his car, but he did not give Mr. James an opportunity to call a friend or family member who might have been able to come pick the car up. And because Mr. James had not been arrested, he easily could have stayed with his car until whoever he designated to pick the car up arrived. Fourth, the car was not implicated in any crime; it was properly registered to Mr. James, and there was no question that he owned the car. Fifth, Mr. James clearly did not want his car towed, but Officer Babadi did not give him any alternatives.

Finally, and perhaps most importantly, Officer Babadi told another officer that he wanted to search Mr. James vehicle because he thought Mr. James was involved in narcotics trafficking, and he was going to try to get Mr. James to consent to a search. Officer Babadi also told the other officer that if he couldn't get consent, he would just tow the car. Officer Babadi knew, of course, that he would be able to do an inventory search of the car if he towed it. When Officer Babadi was unsuccessful at getting Mr. James' consent to search his car, Officer Babadi told the other officer that he would just tow the car and "go from there." These comments suggest that Officer Babadi decided to tow Mr. James' car so that he could search it, not for any legitimate community-caretaking reason.

The search itself supports this finding. Officer Babadi's initial search of the vehicle consisted of a quick rummaging around, during which he seemed to be looking for whatever Mr. James had been hiding when Officer Babadi pulled him over. *See* Def. Exh. D 23:48−23:49. Once he found what he thought were illegal drugs and detained Mr. James, Officer Babadi resumed his search, but he still seemed to be rummaging around, looking for whatever Mr. James might have hidden, as opposed to doing a systematic inventory of the car's contents. Def. Exh. D 23:53−23:54. When Officer Babadi found the gun, he said, "He was stashing the gun—that's what he was doing!," as if he finally found what he had been looking for. Def. Exh. D 23:54. Officer Babadi's decision to impound Mr. James' car was not lawful.

Because the decision to impound Mr. James' car was not lawful, the subsequent inventory search of his car also was not lawful. *See United States v. Pappas*, 735 F.2d 1232, 1234 (10th Cir. 1984) (inventory search of car that was illegally impounded was also illegal). Thus, all the evidence seized pursuant to that search, including the baggie full of suspected narcotics, the cut-off straw, and the firearm, were "fruit of the poisonous tree" and must be suppressed. *See id.* (quoting *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)). None of these items would have been found but for the illegal search. *See id.*

C. The *Miranda* Warnings were Sufficient.

A person's waiver of his or her Fifth Amendment privilege against self-incrimination must be made "voluntarily, knowingly and intelligently." *United States v. Morris*, 287 F.3d 985, 988 (quoting *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). Whether this standard is met "depends in each case upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Maynard v. Boone*, 468 F.3d 665, 676 (10th Cir. 2006) (quoting *Edwards v. Arizona*, 451 U.S. 477, 482 (1981))

(discussing waiver of Sixth Amendment right to counsel). Courts must examine the totality of the circumstances to determine whether a waiver of rights is valid. *See Colorado v. Spring*, 479 U.S. 564, 573 (1987) (holding a Fifth Amendment waiver is valid if the "totality of the circumstances . . . reveal both an uncoerced choice and the requisite level of comprehension"); *Smith v. Mullin*, 379 F.3d 919, 932–33 (10th Cir. 2004) ("Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." (quotation omitted)). The government bears the burden of proving a valid waiver by a preponderance of the evidence. *Morris*, 287 F.3d at 989.

In this case, Mr. James argues that Officer Babadi read him his *Miranda* rights so hurriedly and then started questioning him so quickly that he felt coerced, and that his waiver wasn't knowing and voluntary. *See* Doc. 16 at 12. Although Officer Babadi read Mr. James his rights very quickly, it was not so fast that they were incomprehensible, nor would Mr. James necessarily have felt coerced into answering. Throughout the encounter with Mr. James, Officer Babadi sometimes spoke very quickly. But Officer Babadi never raised his voice, nor did he ever threaten Mr. James. He was polite and conversational throughout the encounter. Moreover, Mr. James demonstrated that he understood that he had rights and did not need to acquiesce to all of Officer Babadi's requests. When Officer Babadi asked Mr. James whether he could search his person and his vehicle, Mr. James agreed to let him search his person, but he refused to let him search the vehicle. Def. Exh. D 23:38, 23:40. When Officer Babadi asked why, Mr. James told him that he knew he had a right to privacy and was protecting it. Def. Exh. D 23:40. Thus, based on the totality of the circumstances, I find that Officer Babadi's recitation of the *Miranda*

warnings was adequate, and that Mr. James' waiver of his rights was voluntary, knowing and intelligent.

The fact that the *Miranda* warnings were sufficient, however, does not end the inquiry as to whether the Court should suppress the incriminating statements. Neither party addressed whether Mr. James' statements were necessarily the fruit of the illegal inventory search, or whether the statements were so attenuated from the illegal inventory search that they may be independently admissible. *See* Doc. 16 at 11−13; Doc. 20 at 10−11. This may be because both parties assume that the statements are tainted by the prior search, or because the government likely will not pursue its case if the Court suppresses the gun found in Mr. James' car. Nevertheless, just to be clear, I recommend that the Court suppress Mr. James' post-*Miranda* statements not only because the statements would not have been made "but for" the illegal impound and inventory search, but also because they are not sufficiently attenuated from that inventory search to dissipate the taint.

The exclusionary rule requires exclusion of evidence that was obtained as a "but-for" result of an illegal search unless the evidence is so far removed from the constitutional violation that the "taint" of the violation no longer clings to it. *Wong Sun*, 371 U.S. at 484 ("The exclusionary prohibition extends as well to the indirect as the direct products of such invasions."). In considering whether an incriminating statement is sufficiently attenuated from an illegal search so as to dissipate any taint, the Court must balance the "temporal proximity of the Fourth Amendment violation," any "intervening circumstances," and the "purpose and flagrancy of the official misconduct." *United States v. King*, 990 F.2d 1552, 1563–64 (10th Cir. 1993); *see also Brown v. Illinois*, 422 U.S. 590, 603–04 (1975) (listing the three factors). "A *Miranda* warning itself may be a significant intervening circumstance that can break any factual

nexus between an illegal search and subsequent incriminating statement." *United States v. Torres-Castro*, 470 F.3d 992, 1001 (10th Cir. 2006). If the government can demonstrate attenuation, the evidence is not fruit of the poisonous tree and the Court need not suppress it. *United States v. DeLuca*, 269 F.3d 1128, 1132 (10th Cir. 2001).

In this case, there is no question that Mr. James would not have made any statements about his status as a felon or about his knowledge of the gun in his car but for the illegal inventory search of his car. Before the search, Mr. James had been told he was free to leave, and he was walking away from Officer Babadi. Once Officer Babadi found what he thought were illegal drugs, he caught up to Mr. James and detained him for further investigation. After Officer Babadi resumed the illegal inventory search, he found the gun underneath the driver's seat. It was only then that Officer Babadi questioned Mr. James about the gun, and Mr. James made his incriminating statements.

Further, the attenuation factors weigh against a finding that there was a break in the factual nexus between the illegal search and Mr. James' statements. Officer Babadi found the gun during the illegal inventory search at about 11:54 pm on February 6, 2017. *See* Def. Exh D 23:54. Approximately six minutes later, after the dispatcher was unable to confirm that Mr. James was a felon, Officer Babadi read Mr. James his *Miranda* rights, then immediately asked Mr. James if he was a felon. *See* Def. Exh. D 00:00. Mr. James was still at the scene, and nothing of consequence occurred in the six minutes between Officer Babadi's discovery of the gun and his advising Mr. James of his *Miranda* rights. *See* Def. Exh. D 23:54−00:00. Unlike the careful administration of *Miranda* warnings[8] that the Supreme Court held could "cure the

---

[8] In *Elstad*, the officer read the defendant his rights from a card that incorporated "the warning that any statements could be used in a court of law; the rights to remain silent, consult an attorney at state expense, and interrupt the conversation at any time; and the reminder that any

condition that rendered the [earlier] unwarned statement inadmissible," *Oregon v. Elstad*, 470 U.S. 298, 310–11 (1985), Officer Babadi's administration of the warnings in this case was perfunctory and within the same course of events that led to the illegal impound and inventory search. The warnings themselves did not serve as an intervening circumstance. With regard to the purpose and flagrancy of the official misconduct, it does not appear that Officer Babadi set out to violate Mr. James' Fourth Amendment rights. It does appear, however, that Officer Babadi's zealousness for investigating a person whom he believed was involved in narcotics trafficking impaired his judgment and led him to use the FPD's tow policy as a pretext for searching Mr. James' car. On balance, the attenuation factors weigh in favor of suppressing the statements Mr. James made after he was advised of his *Miranda* rights.

## III.   Conclusion

Although Officer Babadi lawfully stopped Mr. James, the subsequent impoundment of Mr. James' vehicle and the inventory search of that vehicle were for investigative purposes. The impoundment and inventory search therefore violated Mr. James' Fourth Amendment rights, and the evidence derived from the search must be suppressed. Further, although Officer Babadi properly advised Mr. James of his *Miranda* rights when he detained him, the statements Mr. James made after he was advised of his rights were the fruit of the illegal inventory search and therefore also must be suppressed.

THEREFORE, for the reasons detailed above, I recommend that the Court GRANT defendant Derek James' Motion to Suppress Tangible Evidence and Statements (Doc. 16).

---

statements must be voluntary." 470 U.S. at 314 n.4. On the back of the card were three questions about whether the defendant understood his rights, whether he had any questions, and whether, with these rights in mind, he wanted to talk to the police officer. *Id.* The officer recorded the defendant's affirmative answers to these three questions on the card. *Id.* Both the officer and the defendant, a recent high school graduate, then signed and dated the card. *Id.*

17

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). Written objections must be both timely and specific.** *United States v. One Parcel of Real Prop., With Buildings, Appurtenances, Improvements, & Contents, Known as: 2121 E. 30th St., Tulsa, Oklahoma*, **73 F.3d 1057, 1060 (10th Cir. 1996). A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition. Failure to file timely and specific objections will result in waiver of** *de novo* **review by a district or appellate court. In other words, if no objections are filed, no appellate review will be allowed.**

/s/ Laura Fashing
Laura Fashing
United States Magistrate Judge