# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                         No. CR 18-3494 JB\LF

DEREK JAMES,

      Defendant.

## MEMORANDUM OPINION AND ORDER ADOPTING
## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

**THIS MATTER** comes before the Court on the Magistrate Judge's Proposed Findings and Recommended Disposition, filed May 15, 2019 (Doc. 29)("PFRD"). In the PFRD, the Honorable Laura Fashing, United States Magistrate Judge for the United States District Court for the District of New Mexico, recommends that the Court grant Defendant Derek James' Motion to Suppress Tangible Evidence and Statements, filed February 25, 2019 (Doc. 16). The PFRD requires the parties to file any objections no later than May 29, 2019. See PFRD at 18. Both Plaintiff United States of America and James filed timely objections. See Objection to Proposed Findings, filed May 29, 2019 (Doc. 36)("James' Objection"); United States' Objections to the Magistrate Judge's Proposed Findings and Recommended Disposition (Doc. 29), filed May 29, 2019 (Doc. 37)("United States' Objections"). The Court conducted a de novo review. Having carefully reviewed the record, including the transcript of the evidentiary hearing and the exhibits admitted into evidence, as well as the PFRD, the United States' Objections, and James' Objection, the Court finds that the Magistrate Judge's recommendation is correct. The Court therefore accepts the findings in the PFRD, adopts Magistrate Judge Fashing's recommendation, and grants James' Motion to Suppress Tangible Evidence and Statements.

## LAW REGARDING OBJECTIONS TO PROPOSED FINDINGS AND RECOMMENDATIONS

District courts may refer suppression motions to a Magistrate Judge for a recommended disposition. See Fed. R. Crim. P. 59(b)(1) ("A district judge may refer to a magistrate judge for recommendation a defendant's . . . motion to suppress evidence . . . . The magistrate judge must promptly conduct the required proceedings."). Rule 59(b)(2) of the Federal Rules of Criminal Procedure governs objections: "Within 14 days after being served with a copy of the recommended disposition, . . . a party may serve and file specific written objections to the proposed findings and recommendations." Fed. R. Crim. P. 59(b)(2). When resolving objections to a magistrate judge's proposal, "[t]he district judge must consider de novo any objection to the magistrate judge's recommendation. The district judge may accept, reject, or modify the recommendation, receive further evidence, or resubmit the matter to the magistrate judge with instructions." Fed. R. Civ. P. 59(b)(3). Similarly, 28 U.S.C. § 636 provides:

> A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

28 U.S.C. § 636(b)(1)(C). Rule 59 of the Federal Rules of Criminal Procedure "is derived in part from Federal Rule of Civil Procedure 72." Fed. R. Crim. P. 59 advisory committee's note to 2005 adoption. The rule's waiver provision "is intended to establish the requirements for objecting in a district court in order to preserve appellate review of magistrate judge's decisions," a procedure the Supreme Court approved in Thomas v. Arn, 474 U.S. 140, 155 (1985). Fed. R. Crim. P. 59 advisory committee's note.

"'The filing of objections to a magistrate's report enables the district judge to focus attention on those issues -- factual and legal -- that are at the heart of the parties' dispute.'" United States v. One Parcel of Real Prop., 73 F.3d 1057, 1059 (10th Cir. 1996)("One Parcel") (quoting Thomas v. Arn, 474 U.S. at 147). As the United States Court of Appeals for the Tenth Circuit has noted, "the filing of objections advances the interests that underlie the Magistrates Act,[1] including judicial efficiency." One Parcel, 73 F.3d at 1059 (citing Niehaus v. Kan. Bar Ass'n, 793 F.2d 1159, 1165 (10th Cir. 1986), superseded by statute on other grounds as stated in De Vargas v. Mason & Hanger-Silas Mason Co., 911 F.2d 1377 (10th Cir. 1990); United States v. Walters, 638 F.2d 947, 950 (6th Cir. 1981)).

The Tenth Circuit has held "that a party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." One Parcel, 73 F.3d at 1060. "To further advance the policies behind the Magistrate's Act, [the Tenth Circuit], like numerous other circuits, ha[s] adopted 'a firm waiver rule' that 'provides that the failure to make timely objections to the magistrate's findings or recommendations waives appellate review of both factual and legal questions.'" One Parcel, 73 F.3d at 1059 (quoting Moore v. United States, 950 F.2d 656, 659 (10th Cir. 1991)). In addition to requiring specificity in objections, the Tenth Circuit has held that "[i]ssues raised for the first time in objections to the magistrate judge's recommendation are deemed waived." Marshall v. Chater, 75 F.3d 1421, 1426 (10th Cir. 1996). See United States v. Garfinkle, 261 F.3d 1030, 1030-31 (10th Cir. 2001)("In this circuit, theories raised for the first

---

[1] Congress enacted the Federal Magistrates Act, 28 U.S.C. §§ 631-639, in 1968.

time in objections to the magistrate judge's report are deemed waived."). In an unpublished

opinion, the Tenth Circuit states that "the district court correctly held that [a petitioner] had waived

[an] argument by failing to raise it before the magistrate." Pevehouse v. Scibana, 229 F. App'x

795, 796 (10th Cir. 2007)(unpublished).[2]

In One Parcel, the Tenth Circuit, in accord with other Courts of Appeals, expanded the

waiver rule to cover objections that are timely but too general. See One Parcel, 73 F.3d at 1060.

The Supreme Court of the United States -- in the course of approving the United States Court of

Appeals for the Sixth Circuit's use of this waiver rule -- noted:

> It does not appear that Congress intended to require district court review of a
> magistrate's factual or legal conclusions, under a de novo or any other standard,
> when neither party objects to those findings. The House and Senate Reports
> accompanying the 1976 amendments do not expressly consider what sort of review
> the district court should perform when no party objects to the magistrate's report.
> *See* S. Rep. No. 94-625, pp. 9-10 (1976)(hereafter Senate Report); H. R. Rep. No.
> 94-1609, p. 11 (1976), U.S. Code Cong. & Admin. News 1976, p. 6162 (hereafter
> House Report). There is nothing in those Reports, however, that demonstrates an
> intent to require the district court to give any more consideration to the magistrate's
> report than the court considers appropriate. Moreover, the Subcommittee that
> drafted and held hearings on the 1976 amendments had before it the guidelines of

---

[2]Pevehouse v. Scibana is an unpublished opinion, but the Court can rely on an unpublished
opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R.
32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive
value."). The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have
> generally determined that citation to unpublished opinions is not favored.
> However, if an unpublished opinion or order and judgment has persuasive value
> with respect to a material issue in a case and would assist the court in its disposition,
> we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005). The Court concludes that
Pevehouse v. Scibana United States v. Lopez-Carillo, Appleby v. Cline, 711 F. App'x 459 (10th
Cir. 2017), and United States v. Sierra-Estrada, 248 F. App'x 973 (10th Cir. 2007), have
persuasive value with respect to material issues and will assist the Court in its disposition of this
Memorandum Opinion and Order.

the Administrative Office of the United States Courts concerning the efficient use of magistrates. Those guidelines recommended to the district courts that "[w]here a magistrate makes a finding or ruling on a motion or an issue, his determination should become that of the district court, unless specific objection is filed within a reasonable time." *See* Jurisdiction of United States Magistrates, Hearings on S. 1283 before the Subcommittee on Improvements in Judicial Machinery of the Senate Committee on the Judiciary, 94th Cong., 1st Sess., 24 (1975)(emphasis added)(hereafter Senate Hearings). The Committee also heard Judge Metzner of the Southern District of New York, the chairman of a Judicial Conference Committee on the administration of the magistrate system, testify that he personally followed that practice. *See id.* at 11 ("If any objections come in, . . . I review [the record] and decide it. If no objections come in, I merely sign the magistrate's order"). The Judicial Conference of the United States, which supported the de novo standard of review eventually incorporated in § 636(b)(1)(c), opined that in most instances no party would object to the magistrate's recommendation, and the litigation would terminate with the judge's adoption of the magistrate's report. *See* Senate Hearings, at 35, 37. Congress apparently assumed, therefore, that any party who was dissatisfied for any reason with the magistrate's report would file objections, and those objections would trigger district court review. There is no indication that Congress, in enacting § 636(b)(1)(c), intended to require a district judge to review a magistrate's report to which no objections are filed. It did not preclude treating the failure to object as a procedural default, waiving the right to further consideration of any sort. We thus find nothing in the statute or the legislative history that convinces us that Congress intended to forbid a rule such as the one adopted by the Sixth Circuit.

Thomas v. Arn, 474 U.S. at 151-52 (footnotes omitted).

The Tenth Circuit has noted, "however, that '[t]he waiver rule as a procedural bar need not be applied when the interests of justice so dictate.'" One Parcel, 73 F.3d at 1060 (quoting Moore, 950 F.2d at 659 ("We join those circuits that have declined to apply the waiver rule to a pro se litigant's failure to object when the magistrate's order does not apprise the pro se litigant of the consequences of a failure to object to findings and recommendations.")). Cf. Thomas v. Arn, 474 U.S. at 154 (noting that, while "[a]ny party that desires plenary consideration by the Article III judge of any issue need only ask," a failure to object "does not preclude further review by the district judge, sua sponte or at the request of a party, under a de novo or any other standard"). In

One Parcel, the Tenth Circuit also noted that the district judge had decided sua sponte to conduct a de novo review despite the lack of specificity in the objections, but the Tenth Circuit held that it would deem the issues waived on appeal, because such action would advance the interests underlying the waiver rule.  See 73 F.3d at 1060-61 (citing cases from other Courts of Appeals where district court elected to address merits despite potential application of waiver rule, but Courts of Appeals opted to enforce waiver rule).

Where a party files timely and specific objections to the Magistrate Judge's proposed findings and recommendation, on "dispositive motions, the statute calls for a *de novo* determination, not a *de novo* hearing."  United States v. Raddatz, 447 U.S. 667, 674 (1980).  "[I]n providing for a '*de novo* determination' rather than *de novo* hearing, Congress intended to permit whatever reliance a district judge, in the exercise of sound judicial discretion, chose to place on a magistrate's proposed findings and recommendations."  United States v. Raddatz, 447 U.S. at 676 (quoting 28 U.S.C. § 636(b) and citing Mathews v. Weber, 423 U.S. 261, 275 (1976)).  The Tenth Circuit requires a "district court to consider relevant evidence of record and not merely review the magistrate judge's recommendation" when conducting a de novo review of a party's timely, specific objections to the magistrate's report.  In re Griego, 64 F.3d 580, 583-84 (10th Cir. 1995). "When objections are made to the magistrate's factual findings based on conflicting testimony or evidence . . . the district court must, at a minimum, listen to a tape recording or read a transcript of the evidentiary hearing."  Gee v. Estes, 829 F.2d 1005, 1008-09 (10th Cir. 1987).

A district court must "clearly indicate that it is conducting a de novo determination" when a party objects to the Magistrate Judge's report "based upon conflicting evidence or testimony." Gee v. Estes, 829 F.2d at 1009.  On the other hand, a district court fails to meet the requirements

of 28 U.S.C. § 636(b)(1) when it indicates that it gave "considerable deference to the magistrate's order." Ocelot Oil Corp. v. Sparro Indus., 847 F.2d 1458, 1464 (10th Cir. 1988). A district court need not, however, "make any specific findings; the district court must merely conduct a *de novo* review of the record." Garcia v. City of Albuquerque, 232 F.3d 760, 766 (10th Cir. 2000). "[T]he district court is presumed to know that de novo review is required. Consequently, a brief order expressly stating the court conducted de novo review is sufficient." Northington v. Marin, 102 F.3d 1564, 1570 (10th Cir. 1996)(citing In re Griego, 64 F.3d at 583-84). "[E]xpress references to de novo review in its order must be taken to mean it properly considered the pertinent portions of the record, absent some clear indication otherwise." Bratcher v. Bray-Doyle Indep. Sch. Dist. No. 42, 8 F.3d 722, 724 (10th Cir. 1993). The Tenth Circuit has previously held that a district court properly conducted a de novo review of a party's evidentiary objections when the district court's "terse" order contained one sentence for each of the party's "substantive claims" and did "not mention his procedural challenges to the jurisdiction of the magistrate to hear the motion." Garcia v. City of Albuquerque, 232 F.3d at 766. The Tenth Circuit has explained that brief district court orders that "merely repeat[] the language of § 636(b)(1) to indicate its compliance" are sufficient to demonstrate that the district court conducted a de novo review:

> It is common practice among district judges in this circuit to make such a statement and adopt the magistrate judges' recommended dispositions when they find that magistrate judges have dealt with the issues fully and accurately and that they could add little of value to that analysis. We cannot interpret the district court's statement as establishing that it failed to perform the required de novo review.

In re Griego, 64 F.3d at 584.

Notably, because "Congress intended to permit whatever reliance a district judge, in the exercise of sound judicial discretion, chose to place on a magistrate's proposed findings and

recommendations," <u>Raddatz</u>, 447 U.S. at 676 (emphasis omitted), a district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate," 28 U.S.C. § 636(b)(1). <u>See</u> <u>Bratcher</u>, 8 F.3d at 724-25 (holding that the district court's adoption of the magistrate judge's "particular reasonable-hour estimates" is consistent with the de novo determination that 28 U.S.C. § 636(b)(1) and <u>United States v. Raddatz</u> require).

## FACTUAL BACKGROUND[3]

Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to state its essential findings on the record when deciding a motion that involves factual issues. <u>See</u> Fed. R. Crim. P. 12(d) ("When factual issues are involved in deciding a motion, the court must state its essential findings on the record."). The findings of fact in this Memorandum Opinion and Order shall serve as the Court's essential findings for rule 12(d) purposes. The Court makes these findings under rule 104(a) of the Federal Rules of Evidence's authority, which requires a judge to decide preliminary questions relating to evidence's admissibility, including a search's or seizure's legality. <u>See</u> <u>United States v. Merritt</u>, 695 F.2d 1263, 1269-70 (10th Cir. 1982). In deciding such preliminary questions, the other rules of evidence, except those with respect to privileges, do not bind the Court. <u>See</u> Fed. R. Evid. 104(a) ("The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible. In so doing, the court

---

[3]The United States does not object to Magistrate Judge Fashing's recitation of the facts. <u>See</u> United States' Objections at 1-9. James objects only to the finding that Farmington Police Department Officer Navid Babadi checked the status of James' driver's license before the stop, not after. <u>See</u> James' Objection at 1. The Court will address this objection in its analysis. However, having read the transcript and reviewed the evidence presented at the hearing, the Court finds that Magistrate Judge Fashing's statement of facts is an accurate recitation of the evidence presented and therefore will reproduce it here.

is not bound by evidence rules, except those on privilege."). Thus, the Court may consider hearsay in ruling on a motion to suppress. See United States v. Lopez-Carillo, 536 F. App'x 762, 768-69 (10th Cir. 2013)(unpublished)("[T]he Supreme Court has made it clear hearsay is admissible in suppression hearings. . . . As a result, the restriction in the Confrontation Clause against admission of testimonial statements . . . is not implicated here." (citing United States v. Matlock, 415 U.S. 164, 172-77 (1974); United States v. Sanchez, 555 F.3d 910, 922 (10th Cir. 2009); United States v. Miramonted, 365 F.3d 902, 904 (10th Cir. 2004))).

1.      On February 6, 2017, Farmington Police Officer Navid Babadi was on patrol. See Draft Transcript of Hearing at 5:25-7:22 (taken April 12, 2019)(Fashing, Hurtado, Fernandez, Babadi)("Tr.").[4]

2.      Babadi saw Defendant Derek James drive by him sometime between 11:00 p.m. and 11:30 p.m. See Tr. 8:2-17 (Babadi, Hurtado); id. at 10:19-22 (Babadi, Hurtado); id. at 28:11-29:1 (Babadi, Hurtado).

3.      Babadi recognized James from prior encounters. See Tr. 8:16-17 (Babadi, Hurtado).

4.      Babadi checked James' license plate and driver's license status on Babadi's mobile system inside his patrol unit, and the system indicated that James' license was suspended. See Tr.

---

[4]"Tr." refers to the transcript of the hearing on April 12, 2019. The number preceding the colon is the page number, and the number following the colon is the line number. The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

8:18-21 (Babadi, Hurtado); <u>id.</u> at 9:14-10:4 (Babadi, Hurtado); <u>id.</u> at 40:2-41:5 (Babadi, Fernandez); <u>id.</u> at 42:4-24 (Babadi, Fernandez).[5]

5.      Babadi engaged his emergency equipment and stopped James.  <u>See</u> Tr. 8:22-24 (Babadi, Hurtado); <u>id.</u> at 10:5-14 (Babadi, Hurtado).

6.      Once he engaged his emergency equipment, Babadi's dash camera automatically recorded the events from approximately one minute before he turned on the equipment until Babadi pulled over James, and Magistrate Judge Fashing admitted that video recording into evidence as Defendant's Exhibit C.  <u>See</u> Tr. 31:1-15 (Fashing); <u>id.</u> at 32:21-22 (Fernandez); <u>id.</u> at 33:16-21 (Babadi, Fashing); Dashcam Video (taken February 6, 2017), admitted April 12, 2019, at hearing as Defendant's Exhibit C.

---

[5]There was a lot of discussion at the hearing about whether the National Crime Information Center ("NCIC") Request Inquiry is a record of Babadi running checks on James license plate on the mobile unit inside his patrol car.  <u>See</u> NCIC Request Inquiry at 1 (undated), admitted April 12, 2019, at hearing as Defendant's Exhibit B ("NCIC Inquiry").  Babadi believed that there was a record of the inquiries, but he had not seen the record, and he did not know whether the NCIC Inquiry was this record.  <u>See</u> Tr. at 46:11-49:1 (Babadi, Fernandez).  Because the timestamp on the video of Babadi's conversation with dispatch after the stop was almost identical to the first time that Babadi checked James' license plate,  according to the NCIC Inquiry, James suggested that Babadi did not check the status of James' license until after he stopped James.  <u>See</u> Tr. at 48:20-52:13 (Babadi, Fernandez).  Babadi had no explanation for this other than to say that the lapel camera and the mobile computer system in his patrol unit are different systems, and, therefore, the two systems would not necessarily show the same time.  <u>See</u> Tr. at 51:20-52:13 (Babadi, Fernandez).  Babadi insisted that he ran James' license plate before he stopped James, <u>see</u> Tr. 51:25 (Babadi), and his statement to James when he first approached him that he stopped him for a suspended license supports that testimony, <u>see</u> Tr. at 11:16-18 (Babadi, Hurtado); Lapel Camera Video at 23:28 (taken February 6, 2017), admitted April 12, 2019, at hearing as Defendant's Exhibit D.  At the conclusion of the hearing, Sergeant Travis Spruell with the Farmington Police Department confirmed that the NCIC Inquiry is a record of Babadi's queries on James' license plate from the mobile system in Babadi's patrol car.  <u>See</u> Tr. at 113:16-115:12 (Spruell, Fernandez).

7.　James pulled into a parking area near San Juan and Scott in Farmington, New Mexico.  See Tr. 10:12-14; id. at 64:12-65:3; Dashcam Video at 01:02-23 (showing that James pulled off the road into a parking area).

8.　Before James stopped, Babadi saw him moving around inside his car, which Babadi described as a "furtive movement."  Tr. at 10:14-18 (Babadi, Hurtado); id. at 13:8-14 (Babadi, Hurtado); id. at 65:4-16 (Babadi, Fernandez).

9.　Babadi thought that James might be hiding something.  See Tr. at 65:17-66:11 (Babadi, Fernandez).

10.　Babadi got out of his patrol unit and told James from the driver's side window that he pulled James over for a suspended license.  See Tr. at 11:14-18 (Babadi, Hurtado); Dashcam Video at 01:40-43; Lapel Camera Video at 23:28 (taken February 6, 2017), admitted April 12, 2019, at hearing as Defendant's Exhibit D.[6]

11.　Babadi asked James for his driver's license, registration, and insurance, and James handed him a state identification card and his registration, but could not find his proof of insurance. See Tr. at 54:8-12 (Babadi, Fernandez); Lapel Camera Video at 23:28-23:29.

12.　After a short conversation, Babadi went back to his patrol unit to check with dispatch to confirm that James' license was suspended.  See Tr. at 11:19-12:7 (Babadi, Hurtado); Lapel Camera Video at 23:28-23:32.

---

[6]The Lapel Camera Video is the audio and video recording from Babadi's lapel camera. The time notation is from the lower right-hand corner of the video.  The number before the colon is the hour in military time, and the number after the colon is the minute.

13.     Babadi checked with dispatch to confirm that James' license was suspended, and he also asked whether there were any warrants for James' arrest originating in any other jurisdictions.  See Tr. at 12:5-19 (Babadi, Hurtado).

14.     The dispatch operator confirmed that James' license was invalid, but she did not use the word suspended.  See Tr. at 58:22-60:9 (Babadi, Fernandez).

15.     The dispatch operator said the license was "invalid-expired," although the expiration date which she gave was a date in the future.  Tr. at 60:8-15 (Babadi, Fernandez).

16.     Babadi insisted, however, that the license was invalid.  See Tr. at 60:16-62:18 (Babadi, Fernandez).

17.     Babadi asked the dispatch operator to send a backup officer.  See Tr. at 13:5-7 (Babadi, Hurtado).

18.     The backup officer, Sergeant Lacy, arrived before Babadi returned to talk to James.  See Tr. at 13:5-10 (Babadi, Hurtado); Lapel Camera Video at 23:35.

19.     When Lacy arrived, Babadi told him -- out of James' earshot -- that James' license was suspended and that James did not have insurance, but that, as soon as Babadi stopped him, "he like stuffed something under the seat."  Lapel Camera Video at 23:35.

20.     Babadi added: "I've dealt with him before.  I know he's Code 12."  Lapel Camera Video at 23:35.

21.     "Code 12" means that Babadi thought that James was involved in narcotics activity.  Tr. at 67:14-68:12 (Babadi, Fernandez).

22.     Babadi also told Lacy: "I'm gonna see if he's gonna give me consent to search the vehicle."[7]  Lapel Camera Video at 23:35.

23.     Babadi added: "If not, I'm gonna . . . uh . . . gonna tow it just due to his suspension . . . ."[8]  Lapel Camera Video at 23:35-36.

24.     After his conversation with Lacy, Babadi went back to James and asked him to step out of his car so that Babadi could ask him about the "furtive movement" he saw just before the stop.  Tr. at 13:8-10 (Babadi, Hurtado).

25.     James said he had just been reaching for his wallet.  See Tr. at 13:11-14 (Babadi, Hurtado).

26.     When James got out of his car, Babadi asked him if he had any illegal items on him and whether he could search his person.  See Tr. at 13:21-14:5 (Babadi, Hurtado).

27.     James consented to a search of his person, and Babadi did not find anything illegal on him.  See Tr. at 13:24-14:5 (Babadi, Hurtado).

28.     James refused to let Babadi search his car.  See Tr. at 71:16-18 (Babadi, Fernandez); Lapel Camera Video at 23:38-40.

29.     At that point, Babadi again went to talk to Lacy out of James' hearing.  See Lapel Camera Video at 23:41.

---

[7]The discussion of Babadi's conversations with Lacy at the hearing is slightly different and a little confusing.  See Tr. 66:15-72:25 (Babadi, Fernandez).  The Court relies, therefore, on the video of the encounter to determine what was said and in what sequence.  See Lapel Camera Video at 23:35-23:36; id. at 23:41.

[8]The Court cannot discern what Babadi said at the end of this sentence despite playing the Lapel Camera Video multiple times.

30.     Babadi told Lacy, "I'm just gonna tow it due to his suspension and no insurance, and go from there."  Lapel Camera Video at 23:41.

31.     Babadi stated that he decided to tow James' car based on "department policy and procedures."  Tr. at 14:9-10 (Babadi, Hurtado).

32.     Farmington Police Department ("FPD") Policy and Procedure 261-17 -- Towing Services and Circumstances allows police officers to tow vehicles if "there's an arrest incident or if there's lack of a licensed driver, suspended driver, or no insurance, registrations.  If the car hasn't been registered, I believe it's for one year."  Tr. at 14:15-18 (Babadi, Hurtado); FPD Policy and Procedure 261-17 -- Towing Services and Circumstances at 3 (dated August 14, 2018), admitted April 12, 2019, at hearing as Defendant's Exhibit E ("FPD Towing Policy").[9]

33.     The FPD Towing Policy states, in pertinent part:

An officer may consider towing a vehicle under any of the following circumstances: . . . Whenever the operator of the vehicle is found to have suspended or revoked driving privileges and there exists no properly licensed driver, designated by the owner of the vehicle, readily available to drive the vehicle.

FPD Towing Policy at 3.

34.     The FPD Towing Policy further provides:

An officer may consider alternative methods of releasing the vehicle to the licensed owner, other than removing of a vehicle by towing, under situations wherein the volume of calls for service, roadway conditions, or other circumstances or factors allow for an officer to research alternative methods.  An officer may not release a

---

[9]Both James and the United States attached identical FPD policies to their filings as exhibits.  Compare FPD Policy and Procedure 261-17 -- Towing Services and Circumstances (dated August 14, 2018), admitted April 12, 2019, at hearing as Defendant's Exhibit E ("FPD Towing Policy") with FPD Policy and Procedure 261-17 -- Towing Services and Circumstances (dated August 14, 2018), admitted April 12, 2019, at hearing as Government's Exhibit 1 ("FPD Towing Policy").  Both exhibits were admitted into evidence without objection.  See Tr. at 31:16-33:4 (Fashing, Fernandez, Hurtado).

vehicle to a person who has consumed alcohol or who is suspected of otherwise being impaired.

FPD Towing Policy at 3.

35.     Babadi stated that he decided to tow James' car "[b]ecause of the insurance and no license." Tr. at 15:14 (Babadi, Hurtado).

36.     Babadi "could have not towed the vehicle," yet stated that there was "really, no alternative. [James] was the only one there." Tr. at 73:15-23 (Babadi, Fernandez).

37.     Babadi could have permitted James to call a licensed driver to come pick up the car. See Tr. at 73:24-74:8 (Babadi, Fernandez).

38.     Babadi did not explore alternatives to towing James' car even though James had a cellular telephone on him and conceivably could have called someone to get his car. See Tr. at 75:22-76:19 (Babadi, Fernandez).

39.     Babadi told James that he was free to go, but that Babadi was going to tow James' car. See Tr. at 15:5-13 (Babadi, Hurtado); Lapel Camera Video at 23:41.

40.     James objected to Babadi towing James' car, but James ultimately acquiesced and walked away. See Lapel Camera Video at 23:41-23:47.

41.     Babadi performed a tow inventory of James' car. See Tr. at 15:14-17 (Babadi, Hurtado); Lapel Camera Video at 23:48.

42.     Babadi usually starts vehicle inventory searches at the driver's side, because "that's where most people put their valuables, in the center console or driver door pocket or around the driver." Tr. at 79:2-80:3 (Babadi, Fernandez).

43.     During the initial inventory, Babadi did not write down or call out the name of any items that he found. See Tr. at 77:17-78:6 (Babadi, Fernandez).

44. During this initial inventory, Babadi found a white baggie containing a white substance and a cut straw. See Tr. at 15:23-16:7 (Babadi, Hurtado).

45. Babadi suspected that the white substance was an illegal narcotic and that the cut straw was drug paraphernalia. See Tr. at 15:25-16:7 (Babadi, Hurtado).

46. Because James was still within sight, Babadi approached James and detained him for further investigation. See Tr. at 16:10-16 (Babadi, Hurtado); id. at 88:12-90:7 (Babadi, Fernandez).

47. When Babadi returned to James' car, Babadi continued the search and found a firearm underneath the driver's seat.[10] Tr. at 16:19-24 (Babadi, Hurtado).

48. The firearm that Babadi found was a Hi-Point handgun with an attached magazine. See Tr. at 16:25-17:24 (Babadi, Hurtado).

49. Shortly after Officer Babadi found the handgun, Babadi advised James of James' Miranda rights, which James appeared to understand. See Tr. at 18:1-5 (Babadi, Hurtado); id. at 18:14-19:25 (Babadi, Hurtado); id. at 91:5-23 (Babadi, Fernandez).

50. Babadi questioned James about the handgun and the white substance that Babadi found inside James' vehicle. See Tr. at 18:6-7 (Babadi, Hurtado).

51. James told Babadi that the white substance belonged to his roommate, who, according to James, had died recently, and denied knowing that the gun was in his car, although

---

[10]During the second search, Babadi again did not write down or call out the name of any of the items he was finding. See Tr. at 78:11-23 (Babadi, Fernandez). Babadi explained that he could "always go back and put in miscellaneous documents, clothes, and put what's on the inside of the vehicle." Tr. 78:21-23 (Babadi, Fernandez).

James also said that the gun belonged to his deceased roommate.  See Tr. at 18:8-12; Lapel Camera Video at 00:00-00:02; id. at 00:09.

52.     James admitted that he is a felon.  See Tr. at 20:5-6 (Babadi, Hurtado); Lapel Camera Video at 00:00.

53.     Babadi arrested James for being a felon in possession of a firearm.  See Tr. at 20:1-9 (Babadi, Hurtado).

54.     Babadi field-tested the white substance, and it tested presumptively positive for cocaine.  See Tr. at 20:10-21:4 (Babadi, Hurtado).

55.     Babadi also charged James with possession of a controlled substance.  See Tr. at 21:5-8 (Babadi, Hurtado).

56.     Ultimately, however, forensic testing of the white substance indicated that it was not a controlled substance.  See Tr. at 21:19-24 (Babadi, Hurtado).

57.     After Babadi arrested James, Babadi completed the inventory search of James' car. See Tr. at 80:22-82:25 (Babadi, Fernandez).

58.     During this final inventory search, Babadi called out the items inside the vehicle to a community service officer who had arrived at the scene to assist with the search and tow.  See Tr. at 80:25-83:11 (Babadi, Fernandez); id. at 84:21-86:23 (Babadi, Fernandez).

59.     Before the tow truck arrived, a community service officer completed the Vehicle Tow and Owner/Custodian Release, Hold Harmless and Indemnification Form that listed the items in James' vehicle.  See Vehicle Tow and Owner/Custodian Release, Hold Harmless and

Indemnification Form at 1 (dated February 7, 2017), admitted April 12, 2019, at hearing as Government Exhibit 2 ("Vehicle Tow Form").

## ANALYSIS

Having conducted a de novo review, the Court concludes that both the United States' Objections and James' Objection lack a sound basis in the governing law of the Tenth Circuit. The Court therefore will overrule the objections, and adopt Magistrate Judge Fashing's recommendations. The Court will grant James' Motion to Suppress Tangible Evidence and Statements for the reasons outlined below.

James objects to Magistrate Judge Fashing's factual finding that Babadi ran a search of James' license plate and discovered that James' driver's license had been suspended before Babadi stopped James. See James Objection at 1. James further argues that without this factual finding, Babadi did not have reasonable suspicion to stop James, and that the stop itself was therefore unlawful. See James Objection at 5. For the reasons discussed below, the Court credits Babadi's testimony that he discovered that James' driver's license was suspended before he stopped James. Babadi therefore had reasonable suspicion to stop James, and the stop itself was lawful.

The United States objects to Magistrate Judge Fashing's determination that Babadi's decision to impound James' car was not made according to standardized procedures and was motivated by his desire to search the car, not by a legitimate, non-pretextual community-caretaking rationale. See United States' Objections at 1. The United States also argues that Babadi's decision to tow the car is invalid only if Babadi's desire to search the car was his sole motivation for requesting the tow. See United States' Objections at 7-9. For the reasons outlined below, the Court concludes that Babadi's desire to conduct an inventory search of the car was the only reason

he decided to tow James' car.  The corresponding search therefore violated the Fourth Amendment.  The Court will overrule both the United States' Objections and James' Objection.

### A.    THE TRAFFIC STOP WAS VALID.

As Magistrate Judge Fashing stated, there is no dispute that a traffic stop is a seizure within the meaning of the Fourth Amendment.  See Brendlin v. California, 551 U.S. 249, 255 (2007).  A police officer may stop a motorist if the officer has "articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law."  Delaware v. Prouse, 440 U.S. 648, 663 (1979).  Whether the police officer has any other motivation for stopping the vehicle or its driver is irrelevant.  See United States v. Cervine, 347 F.3d 865, 870 (10th Cir. 2003). See also Whren v. United States, 517 U.S. 806, 813 (1996)("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.").

In this case, Babadi testified that when he saw James drive by him, he ran James' license plate through the mobile system in his patrol unit, and the results showed that James' driver's license was suspended.  If this is true, this information provided Babadi with reasonable suspicion that James was driving the vehicle without a valid driver's license, which was sufficient to justify the stop.  James argues, however, that Babadi's testimony is not credible, and that the Court should not believe him.  See James Objection at 2.

James first contends that Babadi's prior interactions with James provided another motivation for the officer to stop him.  See James' Objection at 2.  As noted above, however, Babadi's subjective motivation for stopping James is irrelevant.  See Whren v. United States, 517 U.S. at 813; United States v. Cervine, 347 F.3d at 870.

James next points to the lack of documents that show "that Officer Babadi accessed a license database prior to the stop or that Mr. James' license was indeed suspended." James' Objection at 3. James relies on the timestamps on the National Crime Information Center ("NCIC") Request Inquiry to argue that Babadi's version of events is not plausible. See James' Objection at 3-4; NCIC Request Inquiry at 1 (undated), admitted April 12, 2019, at hearing as Defendant's Exhibit B ("NCIC Inquiry"). James says that the first timestamp on the NCIC Inquiry that relates to his vehicle is at 23:31:23, which was after Babadi stopped him -- not before -- at least according to the timestamp on Babadi's lapel camera. See James' Objection at 3-4. James also points out that this timestamp corresponds to the time after the stop when Babadi was inside his patrol unit checking with dispatch to confirm that James' license was suspended. See James' Objection at 3-4; compare NCIC Inquiry at 1 with Lapel Camera Video at 23:31. The problem with this theory, however, is that the second timestamp on the NCIC Inquiry is 23:38:50. Babadi's lapel camera shows that at 23:38, Babadi was patting down James and was not inside his patrol unit conducting a second search of James' driver's license status. Compare NCIC Inquiry at 1 with Lapel Camera Video at 23:38. James offers no plausible explanation for this, and the Court finds that the more reasonable explanation is the one that Babadi offers: the computer system inside his patrol unit was not in sync with his lapel camera, and the timestamps on the two devices do not match up. Furthermore, Babadi told James immediately upon stopping him that he stopped him for driving with a suspended license. See Lapel Camera Video at 23:28. The Court finds it unlikely that Babadi would say this if he had no information that James' license was suspended before he stopped him.

James also argues that Babadi's testimony suggests that there were four to five minutes between his first query and his second -- the one before he stopped James and the one after. See James' Objection at 3. James argues that, because the timestamps on the NCIC Inquiry show a seven-minute span between the two queries, Babadi's story is not credible. See James' Objection at 3. The Court finds this argument unpersuasive. That Babadi does not remember exactly how many minutes -- whether it was four, five or seven -- separated the two queries on his mobile computer system more than two years after the event is not surprising. The time difference between Babadi's testimony and the timestamps on the NCIC Inquiry is not important and does not undermine Babadi's credibility.

James also argues that it was odd for Babadi not to mention to dispatch the information that he had obtained when he conducted the query, and that the information that dispatch had was different from what he had. See James' Objection at 4-5. The Court does not conclude that Babadi's omission is odd. The dispatch operator was assisting other officers while she was helping Babadi, so Babadi not chatting with her is not odd. See Lapel Camera Video at 23:29-23:32. When the dispatch operator told Babadi that James' license returned "invalid/expired," Babadi asked her if it gave a reason for the "suspension," see Lapel Camera Video at 23:31, as if "invalid/expired" were the same as "suspended." In other words, Babadi asked the dispatch officer for further information and first receiving some information from his query on the mobile computer inside his patrol vehicle.

James next argues that Babadi's testimony is not credible because he did not question the accuracy of the timestamp on his lapel camera until it came to light that the timestamps on the NCIC Inquiry did not comport with Babadi's testimony. See James' Objection at 3-4. Again, the

Court does not find this persuasive. Babadi made clear that he had never seen the NCIC Inquiry, and that he had not previously seen a record of him checking someone's license plate on his mobile system. See, e.g., Tr. at 37:23-39:13 (Babadi, Fernandez); id. at 46:11-49:1 (Babadi, Fernandez). Babadi was confident, however, that he had checked James' license plate before -- not after -- he stopped James. See Tr. at 51:20-52:13 (Babadi, Fernandez). The only explanation Babadi had for the time discrepancies was that the timestamps were from two different systems, and "[t]hey do not talk to each other to be on the same timestamp." Tr. at 52:1-13 (Babadi, Fernandez). The Court concludes that this testimony does not undermine Babadi's credibility.

James also argues that, because "the database query printout distinguishes 'person' searches and 'vehicle' searches," there was no "evidentiary support" for Babadi's testimony that a license plate search will bring up the driver's license status of the registered owner of the car. James' Objection at 4. James argues that FPD Sergeant Travis Spruell's testimony "about the various things that the mobile system would report" does not include the driver's license status of the car's registered owner. James' Objection at 4. First, Babadi's testimony is "evidentiary support" for what he is able to see when he runs a license plate query on his mobile system. Second, Spruell's testimony did not conflict with Babadi's testimony. Spruell was asked for what the mobile system is used, and he responded:

> The system is used for a number of things. We can do inquiries on the system of, say, an individual. We can find out if they have any local warrants. We can also use it to run license plates. It will give us a return. Whether the vehicle has a valid registration. Whether or not they have insurance on it.

Tr. at 108:15-25 (Spruell, Hurtado). There is no indication that this list is exhaustive of everything that one could learn from the mobile system. There is no follow-up question whether this is everything that the system can do, and the context suggests that these are examples of what one

could learn from running a license plate. The Court does not agree that Spruell's testimony undermines Babadi's testimony that running a license plate would provide the driver's license status of the vehicle's registered owner.

James further argues that "[n]o evidence introduced at the hearing supported the testimony that Mr. James' license was in fact suspended as Officer Babadi alleged." James' Objection at 5. However, to stop James, Babadi only had to have a reasonable suspicion that James' license was suspended, not that it actually was suspended. See Delaware v. Prouse, 440 U.S. at 663. Officer Babadi's testimony that the information on his mobile system showed that James' license was suspended, in combination with Babadi's statements to James immediately upon stopping him that the suspension is why Babadi stopped him, demonstrate to the Court's satisfaction that Babadi had reasonable suspicion to stop James. Furthermore, although this observation does not enter into the Court's analysis whether Babadi's stop was lawful, neither party disputes that James did not have a valid driver's license in his possession when he was stopped. See Tr. 54:8-12. When Babadi told James that his license returned suspended, James explained to Babadi that, two months earlier, in December, 2016, James had had an interlock license but that his license was now fully valid. See Lapel Camera Video at 23:28. This evidence at least shows that there had been an issue with James' license within the recent past.

James' final argument is that, although Babadi had the capacity to record the inquiry he performed on his mobile system before he stopped James, that Babadi chose not to do so undermines Babadi's credibility. See James' Objection at 5. The Court does not endorse this view. The Court does not expect law enforcement officers to record every act they take. Such a requirement would be overly burdensome. The Court credits Babadi's testimony and concludes

that Babadi's stop of James was lawful. The Court overrules James' Objection to Magistrate Judge Fashing's PFRD.

## B. THE IMPOUNDMENT AND SUBSEQUENT INVENTORY SEARCH OF JAMES' VEHICLE IS UNLAWFUL.

The United States does not object to Magistrate Judge Fashing's recitation of the law that governs whether the decision to impound James' car and the subsequent inventory search of that car is lawful. See United States' Objections at 2, 5-6 (relying on the same law that Magistrate Judge Fashing recites). Accordingly, the Court repeats here the law that governs the determination whether an impoundment and subsequent inventory search of a vehicle is legal.

The United States bears the burden of proving that the impoundment of a vehicle and any subsequent inventory search of that vehicle is reasonable under the Fourth Amendment. United States v. Sanders, 796 F.3d 1241, 1244 (10th Cir. 2015); United States v. Taylor, 592 F.3d 1104, 1107 (10th Cir. 2010). "[I]mpoundment of a vehicle located on private property that is neither obstructing traffic nor creating an imminent threat to public safety is constitutional only if justified by both a standardized policy and a reasonable, non-pretextual community-caretaking rationale." United States v. Sanders, 796 F.3d at 1248. Similarly, "[g]ranting police discretion over whether to impound and inventory a vehicle is permissible so long as officers exercise that discretion according to standardized criteria, and not 'in bad faith or for the sole purpose of investigation.'" Taylor, 592 F.3d at 1108 (quoting and citing to Colorado v. Bertine, 479 U.S. 367, 372, 374-75 (1987)). In other words, unlike most areas of Fourth Amendment law, the police officer's motive in deciding to impound a vehicle and in conducting an inventory search of that vehicle is determinate.

In determining whether a legitimate, non-pretextual community-caretaking rationale supports an impoundment decision, the Tenth Circuit has directed courts to consider the following, non-exhaustive list of factors:

> (1) whether the vehicle is on public or private property; (2) if on private property, whether the property owner has been consulted; (3) whether an alternative to impoundment exists (especially another person capable of driving the vehicle); (4) whether the vehicle is implicated in a crime; and (5) whether the vehicle's owner and/or driver have consented to the impoundment.

United States v. Sanders, 796 F.3d at 1250. If the Court determines that the decision to impound the vehicle was lawful, it then must determine whether the subsequent inventory search of the vehicle was lawful. See United States v. Sanders, 796 F.3d at 1244 n.1 ("Though impoundments and inventory searches often occur sequentially, they are subject to different legal standards"). An inventory search is lawful if "conducted according to standardized procedures." United States v. Haro-Salcedo, 107 F.3d 769, 772 (10th Cir. 1997). The search cannot "be a ruse for a general rummaging in order to discover incriminating evidence." United States v. Haro-Salcedo, 107 F.3d at 772-73.

1.      **The Government Has Failed to Prove that Officer Babadi's Decision to Impound Mr. James' Car Was Made Pursuant to Standardized Policies.**

The first issue with respect to whether Babadi's decision to impound the vehicle was lawful is whether standardized criteria guided his decision. See United States v. Sanders, 796 F.3d at 1248-49. The United States argues that Babadi made his decision pursuant to FPD's policies, and that Magistrate Judge Fashing's conclusion to the contrary is wrong. See United States' Objections at 2-5. The United States takes issue primarily with Magistrate Judge Fashing's conclusion that "Officer Babadi's failure to even inquire as to whether Mr. James could designate a properly licensed driver who was 'readily available' to come pick up his car demonstrates that the decision

to tow the vehicle was not made according to FPD's standardized procedures." United States' Objections at 3 (quoting PFRD at 11). The United States contends that the law does not impose on police officers any requirement that they permit an unlicensed driver -- one who, the Court notes, has not been arrested -- to find another licensed driver to take possession of his or her car. See United States' Objections at 3-5.

As an initial matter, the Court is not convinced that the United States has met its burden of proving that any standardized procedures governed Babadi's decision to impound James' car. At the hearing, both the parties and Magistrate Judge Fashing relied on the FPD Towing Policy as the relevant tow policy. See Tr. at 31:16-32:25 (Fashing)(admitting FPD Towing Policy and other exhibits into evidence); id. at 14:6-15:4 (Babadi, Hurtado)(describing FPD Towing Policy). However, the FPD Towing Policy shows that it became effective August 14, 2018, more than a year after this stop took place. Compare FPD Towing Policy at 1 ("Effective Date: 08/14/2018") with Tr. at 7:14-16 (Babadi, Hurtado)(indicating that the traffic stop in this case occurred on February 6, 2017). Based on the evidence, the Court cannot conclude whether there was a standardized policy in place on February 6, 2017.

In addition, having conducted a de novo review of the evidence, the Court notes that this case is similar to the Tenth Circuit's decision in United States v. Sanders, 796 F.3d at 1250, and that standardized criteria did not guide Babadi's decision to tow James car. In United States v. Sanders, unlike here, the police officers arrested the driver of the vehicle before they decided to tow the car, and the driver's companion was arrested shortly thereafter. See United States v. Sanders, 796 F.3d at 1243 (stating that the driver was immediately arrested, and her companion arrested shortly thereafter, and although driver gave permission for a third party to come pick up

the car, police did not ask the driver whether she knew anyone who could remove the car). In other words, the driver in United States v. Sanders was less able to take responsibility for her car than James was, because Babadi has not arrested James when Babadi decided to tow James' car. Even though police had arrested both the driver and her companion in United States v. Sanders, the Tenth Circuit concluded that "impoundment was impermissible because the officers were not guided by standardized criteria." United States v. Sanders, 796 F.3d at 1250. The Tenth Circuit concluded the following information relevant to that determination. First, the "vehicle was legally parked in a private lot, and there is no evidence that it was either impeding traffic or imposing a risk to public safety." United States v. Sanders, 796 F.3d at 1250. Although the municipal code authorized the impoundment of vehicles from public property, it did not mention the impoundment of vehicles from private parking lots. See United States v. Sanders, 796 F.3d at 1250. Second, the municipal policy permitted the police to offer the driver the option of releasing the police from potential liability if not towed, or of having the vehicle towed by a private company. See United States v. Sanders, 796 F.3d at 1250. The police did not offer, however, the driver either of these options, nor did they explain why they failed to mention either option. See United States v. Sanders, 796 F.3d at 1250. Third, the municipal policy did not limit officer discretion in deciding whether to leave a car at the scene or impound it or allow the driver to have the car privately towed. See United States v. Sanders, 796 F.3d at 1250. The Tenth Circuit concludes that this factor shows that the "policies insufficiently limited officer discretion to impound vehicles from private lots." United States v. Sanders, 796 F.3d at 1250.

Here, Mr. James was not arrested, and as already mentioned, he had more ability than the driver in United States v. Sanders to seek alternatives to towing, had Babadi offered him such

alternatives.  FPD policies -- at least the ones in effect after August 14, 2018 -- provided that an officer "*may* consider towing a vehicle" if the driver of the vehicle "is found to have suspended or revoked driving privileges and there exists no properly licensed driver, designated by the owner of the vehicle, readily available to drive the vehicle."  FPD Towing Policy at 3 (emphasis added). In other words, and as Babadi acknowledges, the circumstances did not require Babadi to tow James' vehicle.  See Tr. at 73:15-74:8 (Babadi, Fernandez).  The FPD Towing Policy also provides that an "officer *may* consider alternative methods of releasing the vehicle to the licensed owner, other than removing of a vehicle by towing, under situations wherein the volume of calls for service, roadway conditions, *or other circumstances or factors* allow for an officer to research alternative methods."  FPD Towing Policy at 3 (emphasis added).  See Tr. at 73:15-74:8 (Babadi, Fernandez).  In other words, as was true in United States v. Sanders, FPD policies permit officers to tow a vehicle or not tow a vehicle, but the policies themselves did not "limit[] officer discretion in deciding whether to impound a vehicle" or to "research alternative methods," except that it prohibited officers from releasing "a vehicle to a person who has consumed alcohol or who is suspected of otherwise being impaired."  FPD Towing Policy at 3.  Furthermore, similar to the form used in United States v. Sanders, FPD used a "Vehicle Tow and Owner/Custodian Release, Hold Harmless and Indemnification Form," which permits the registered owner or legal custodian of a vehicle to request that the police "NOT TOW" a vehicle, and release the police for any liability resulting from that request.  Compare United States v. Sanders, 796 F.3d at 1243 with Vehicle Tow Form at 1.  Unlike the FPD policies that the parties relied on at the hearing in this matter, the policy that permitted the police to offer this option to James clearly was in effect on February 7, 2017, because it appeared on the same form on which the contents of James' vehicle were recorded.

See Vehicle Tow Form at 1.  But, as was true in United States v. Sanders, Babadi did not offer James this option, nor did Babadi explain why he did not to mention this option to James.  See United States v. Sanders, 796 F.3d at 1250.

In sum, the United States has not carried its burden of proving that standardized criteria guided Babadi's decision to tow James' car.  The policies on which Babadi supposedly relied did not take effect until more than a year after Babadi stopped James.  Although the form on which James' car's contents are listed permits James to request that the police not tow his car, provided he release the police from liability, Babadi did not give James the option to make this request, nor did Babadi explain why he did not give James this option.  Finally, the policies on which Babadi purportedly relied -- although they were not yet in effect -- did not limit Babadi's discretion in any way.  The policies permitted, but did not require, Babadi to tow James' car under certain circumstances, and permitted Babadi to tow the car if "other circumstances or factors allow[ed] for an officer to research alternative methods."  FPD Towing Policy at 3.  Standardized criteria did not guide Babadi's decision to tow James' car, and Babadi's decision was therefore unlawful.

As the United States notes, Magistrate Judge Fashing focuses primarily on the policy that permits Babadi to tow a car if the car's driver has "suspended or revoked driving privileges" and "no properly licensed driver, designated by the owner of the vehicle, [is] readily available to drive the vehicle."  See PFRD at 11; FPD Towing Policy at 3.  The United States argues that Magistrate Judge Fashing erred in finding that, under the circumstances in this case, the policies required Babadi at least to inquire whether James could designate a properly licensed driver who was readily available to come pick up his car.  In making its argument, the United States cites to several cases, all of which are distinguishable.

First, the United States cites to the Court's decision in <u>United States v. Jacquez</u>, 409 F. Supp. 2d 1286 (D.N.M. 2005)(Browning, J.).  <u>See</u> United States' Objections at 4.  In <u>United States v. Jacquez</u>, the police policy at issue "require[d] a vehicle to be towed when the registered owner is arrested or not present."  <u>United States v. Jacquez</u>, 409 F. Supp. 2d at 1297.  The policy did not require that a vehicle be towed if "a non-DWI arrest occurred and the registered owner or the legal custodian request[ed] that the vehicle not be towed."  <u>United States v. Jacquez</u>, 409 F. Supp. 2d at 1297.  In that case, police arrested the vehicle's driver, but he was not the vehicle's registered owner, nor was it apparent that the driver had legal custody of the vehicle, because he had borrowed the car from someone named "Mike," but the car was registered to someone named Tommy Largo.  <u>United States v. Jacquez</u>, 409 F. Supp. 2d at 1297.  Also, the tow policies stated "that a vehicle shall not be towed when the registered owner or the legal custodian requests that it not be towed," and the Court concluded that this policy put the onus on the car's registered owner to make the request that the car not be towed.  <u>United States v. Jacquez</u>, 409 F. Supp. 2d at 1297.  Because neither the registered owner nor a legal custodian was present, and did not request that the car not be towed, the Court concluded that the impoundment and subsequent inventory search of the vehicle was conducted pursuant to department policy.  <u>See</u> <u>United States v. Jacquez</u>, 409 F. Supp. 2d at 1297.

This case is different from <u>United States v. Jacquez</u>.  First, the policy at issue in this case became effective more than a year after Babadi stopped James, which makes it unclear whether the same procedures were in effect on the day of the stop.  Moreover, the policies gave Babadi broad discretion either to tow James' car or not if Babadi concluded that "other circumstances or factors" allowed him "to research alternative methods."  FPD Towing Policy at 3.  This policy

essentially places no limits on Babadi's discretion, which is impermissible under <u>United States v.</u> <u>Sanders</u>. Furthermore, James was the car's registered owner, was present and had not been arrested, and clearly did not want Babadi to tow his car, but Babadi did not give him the option of signing the release and formally requesting that Babadi not tow his car. Instead, Babadi falsely suggested to James that FPD policies required Babadi to tow the car, and that no other options existed. <u>See</u> Lapel Camera Video at 23:41-47. By his own admission, Babadi did not consider any of the other options open to him aside from towing the car and therefore did not follow FPD standardized procedures in deciding to tow James' vehicle.

The United States also cites to an unpublished decision from the United States Court of Appeals for the Eleventh Circuit. <u>See</u> United States' Objections at 4 (citing <u>United States v.</u> <u>Crawford</u>, 294 F. App'x 466 (11th Cir. 2008). In <u>United States v. Crawford</u>, the Eleventh Circuit concluded that the district court did not clearly err in finding that the police officer's search was valid and not pretext for an investigatory search. <u>See</u> 294 F. App'x at 472-73. The policy at issue authorized the police to tow a car if "the operator of a vehicle is arrested, and there is no other person authorized and capable of taking control of the vehicle." <u>United States v. Crawford</u>, 294 F. App'x at 472. The policy permitted an officer to "request, on the operator's behalf, for a driver to be en route from a secondary location, provided that such a request will not cause an unreasonable delay in the arrest procedure." <u>United States v. Crawford</u>, 294 F. App'x at 472. The Eleventh Circuit held that it was not unreasonable under the circumstances for the officer to decide to impound the car, because the driver had been alone in the car when he was arrested, because it was 2:00 a.m., and because "finding another driver at that time would have been unlikely and would have cause significant delays." <u>United States v. Crawford</u>, 294 F. App'x at 473. Although

United States v. Crawford is not binding on the Court, it nonetheless is distinguishable. Here, the policies on which Babadi relied were not in place until more than a year after the stop, James was not arrested, and although the stop occurred after 11:00 p.m., there still was plenty of traffic around, and there was no evidence that letting James call someone to get his car would have caused significant delay. According to the tow form, the car was not towed until 2:35 a.m., approximately three hours after Babadi told James he was going to tow the car. See Vehicle Tow Form at 1. Under the circumstances, it is not unreasonable to believe that James could have called a friend or family member from the area to come pick up his car within a much shorter period of time. Babadi knew that James lived in the area, he knew that James was on his way to see his girlfriend, and because Babadi had not arrested James, James could stay with his car until someone came to get it.

The United States also relies on United States v. Cartwright, 630 F.3d 610 (7th Cir. 2010), another case that is not binding on the Court. In United States v. Cartwright, the United States Court of Appeals for the Seventh Circuit found that the police followed their own procedures in deciding to tow a car, but that fact by itself was not sufficient to "render a particular search or seizure reasonable or otherwise immune from scrutiny under the Fourth Amendment." United States v. Cartwright, 630 F.3d at 614. Consequently, it took an independent look at the policies the police followed. See United States v. Cartwright, 630 F.3d at 614. The policies at issue in United States v. Cartwright permitted the police to impound any vehicle "operated by a non-licensed or suspended driver," or "by [a] person under custodial arrest for any charge." United States v. Cartwright, 630 F.3d at 615. Because the driver had been arrested, and the passenger was unlicensed, the Seventh Circuit found that impoundment was permissible under sufficiently

standardized procedures.  United States v. Cartwright, 630 F.3d at 615.  The Seventh Circuit then examined whether impoundment nevertheless violated the Seventh Circuit's conclusion that impoundment "is only valid if the arrestee is otherwise unable to provide for the speedy and efficient removal of the car from public thoroughfares or parking lots."  United States v. Cartwright, 630 F.3d at 614-15.  The Seventh Circuit found that the record in the case was insufficient to show that the passenger of the car (who had not been arrested) had any means of ensuring the "speedy and efficient" removal of her car.  United States v. Cartwright, 630 F.3d at 615.  The passenger testified vaguely at the suppression hearing that she had called "someone" to get the car, but she did not identify that person, nor did she state how long it would have taken him or her to get there.  United States v. Cartwright, 630 F.3d at 615.  Moreover, although the passenger said she would have allowed an employee of the store where the car was parked to move the car, or even a stranger, the Seventh Circuit held that "[t]he Fourth Amendment does not require that the police offer these sorts of alternatives to impoundment."  United States v. Cartwright, 630 F.3d at 615.

In this case, Babadi was not operating under sufficiently standardized procedures.  As the Court has stated, the written policies submitted into evidence were not in effect on the day that the stop took place.  Furthermore, the policies on which the parties rely gave Babadi nearly unlimited discretion to tow the car, which is not permissible under United States v. Sanders.  Moreover, the circumstances of the stop -- wherein James was not arrested, was the car's registered owner, did not want the car towed, lived in the area, and likely could have called a properly licensed driver to get the car -- are circumstances that would have led a reasonable officer to "research alternative methods," or to inquire whether a "properly licensed driver [was] readily available to drive the

vehicle," or to inquire whether James wanted to request that Babadi not tow his vehicle as permitted on the tow form.  See FPD Towing Policy at 3; Vehicle Tow Form at 1.  Thus, although the Court does not disagree with the Seventh Circuit's holding in United States v. Cartwright, that the Fourth Amendment does not require the police to offer alternatives to impoundment under the circumstances that were present in that case, the Court concludes that, in this case, the United States has not established neither what the FPD standardized policies were nor that Babadi followed them.

### 2. Babadi's Desire to Search James' Vehicle Motivated Babadi's Decision to Impound James' Car.

The United States next contends that "the factors relevant to 'whether an impoundment is justified by a reasonable and legitimate, non-pretextual community-caretaking rationale' weigh in favor of a finding that Officer Babadi's decision to tow the defendant's car was not a pretext for obtaining access to the car to search it."  United States' Objections at 5 (quoting United States v. Sanders, 796 F.3d at 1250).  The non-exhaustive list of factors include:

> (1) whether the vehicle is on public or private property; (2) if on private property, whether the property owner has been consulted; (3) whether an alternative to impoundment exists (especially another person capable of driving the vehicle); (4) whether the vehicle is implicated in a crime; and (5) whether the vehicle's owner and/or driver have consented to the impoundment.

United States v. Sanders, 796 F.3d at 1250.

The United States concedes that the first factor weighs in favor of a finding that the decision to tow James' car was pretextual.  See United States' Objections at 6.  With respect to the second factor, Magistrate Judge Fashing notes that Babadi did not check with anyone at the business associated with the parking lot as to whether the car could be left there, but that the stop was late at night and the business appeared to be closed.  See PFRD at 12.  The United States argues that

the "Magistrate Judge does not cite -- and the United States could not find -- any authority to support her assertion that officers have an affirmative duty to consult with anyone." United States' Objections at 6. In the PFRD, Magistrate Judge Fashing applies correctly the Tenth Circuit's decision in United States v. Sanders, see PFRD at 11-12, wherein the Tenth Circuit concludes that, if a car subject to potential impoundment is on private property, a relevant factor is "whether the property owner has been consulted," United States v. Sanders, 796 F.3d at 1250. In applying this factor in United States v. Sanders, the Tenth Circuit notes that the car at issue "was legally parked on private property, and there is no evidence in the record that the police consulted the owners of the parking lot about the vehicle remaining where it was." United States v. Sanders, 796 F.3d at 1251. The same is true in this case, but because the business where James parked his car appeared closed, the Court views this factor as neutral.

The United States argues that the second factor weighs in its favor, because leaving the car parked in the parking lot overnight could have exposed it to vandalism or theft,[11] and that Babadi was "duty bound to remove the defendant's car from the parking lot." United States' Objections at 6. The Court disagrees with the United States for two reasons. First, James was not arrested, and he could have stayed with his car until he had arranged for a properly licensed driver to move it. Instead, Babadi directed James to leave the area, because Babadi was going to have his car towed. Second, Babadi could have asked James if James wanted to sign the form that released the

---

[11]In United States v. Sanders, the Tenth Circuit cautions courts from accepting potential vandalism and theft as justification for impound decisions, especially if "the owner or driver of a vehicle expresses a willingness to accept the risk of a break-in." 796 F.3d at 1251 n.2. The Tenth Circuit recognizes, however, that this could be a legitimate concern if there was an indication that a vehicle would never be retrieved. See 796 F.3d at 1251 n.2. Based on the circumstances in this case, Babadi's purported concern about vandalism and theft seems pretextual, as there is no evidence that James would not make arrangements to retrieve his car.

FPD from any liability for vandalism or theft, but Babadi chose not to do so.  See Vehicle Tow Form at 1.  The Court therefore does not view this factor as favoring the United States.

The third factor is whether an alternative to impoundment exists (especially another person capable of driving the vehicle).  See United States v. Sanders, 796 F.3d at 1250.  The Court views this factor as weighing against the United States and in favor of a finding that the decision to tow the vehicle was pretextual.  As Magistrate Judge Fashing notes, Babadi did not give James an opportunity to call someone to get his car, even though the circumstances suggested that this was a viable option.  Moreover, although the United States is correct that the Fourth Amendment does not require a police officer to give an individual this option, see United States' Objections at 7 (citing Colorado v. Bertine, 479 U.S. at 373), the Tenth Circuit has held that this is a factor that the Court should consider in determining whether the decision to impound a car is pretextual. Similarly, even if FPD policies also do not require that a police officer give an individual an opportunity to find another driver, this is a factor that the Court considers in determining whether Babadi's decision to tow the car was pretextual.  Furthermore, the Court finds that another alternative existed: Babadi could have asked James if James wanted to release the FPD from liability, pursuant to FPD policy, as the Vehicle Tow Form evinces.  Hence, this factor weighs against the United States.

The fourth factor is whether the vehicle is implicated in a crime.  The United States argues that this factor weighs in its favor because, when Babadi stopped James, Babidi saw James make a "furtive movement," which made Babadi think that James was hiding something in the car. United States' Objections at 7.  This, according to the United States, shows that the car was implicated in a crime, contrary to Magistrate Judge Fashing's conclusion.  The Court disagrees

with the United States. Babadi testified that, as he was pulling over James, he saw James "[m]aking movement within the vehicle," and "leaning forward or side to side . . . ." Tr. at 65:14-16 (Babadi, Fernandez). Although Babadi "suspected that [James] was hiding something, concealing something," he could not tell what it was. Tr. at 65:19-20 (Babadi, Fernandez); id. at 66:5-6 (Babadi, Fernandez). Babadi asserts that the movement was "consistent with somebody trying to conceal items," which "piqued [his] interest." Tr. at 66:8-11 (Babadi, Fernandez). The United States, however, made no attempt to justify Babadi's search of James' vehicle based on probable cause. The Court concludes therefore that Babadi's testimony does not demonstrate that James' car was implicated in a crime. To the contrary, the testimony evinces that the reason Babadi decided to tow James' car was to confirm whether Babadi's hunch was correct. The evidence at the hearing established that Babadi had reasonable suspicion to stop James for driving with a suspended license, but his pre-search interactions with James after the stop did not develop into probable cause to believe that James had committed a crime. James provided a valid registration for the car he was driving. The car was not implicated in criminal conduct. This factor weighs, therefore, against the United States.

The fifth factor is whether the vehicle's owner or driver has consented to the tow. The United States argues that this factor is of "no moment," because, under FPD policies, Babadi had discretion to tow James' car even if James did not consent to the tow. United States' Objections at 7. Again, even if Babadi had discretion to tow James' car, the Tenth Circuit has held that this factor is relevant to determining whether "reasonable and legitimate, non-pretextual community-caretaking rationale" justified Babadi's decision. See United States v. Sanders, 796 F.3d at 1250. Thus, the Court considers this factor, and concludes that it weighs against the United States.

The Court concludes that four of the five factors listed in <u>United States v. Sanders</u> weigh against the United States and in favor of a finding that Babadi lacked a non-pretextual community-caretaking justification for deciding to impound James' car. The Court concludes that one factor -- the second factor -- is neutral. The Court also finds that Babadi's comments to Lacy at the time of the stop, and immediately before Babadi told James that Babadi he was going to tow the car, are particularly telling, because Babadi told Lacy that Babadi was going to try to get James to consent to a search of his vehicle given that Babadi knew he was "Code 12," <u>i.e.</u>, involved with trafficking drugs. Babadi also told Lacy that, if James did not consent to the search of his vehicle, Babadi was just going to tow it, which Babadi knew would permit him to conduct an inventory search. The United States argues that Babadi's investigative purpose in deciding to impound the car does not invalidate the decision provided that Babadi's investigative purpose was not the sole purpose. <u>See</u> United States' Objection at 7-9. Based on the Court's de novo review of the record, however, the Court concludes that Babadi's sole reason for deciding to tow James' car was so that Babadi could search it. The Court concludes, therefore, that Babadi's statements at the time he decided to tow the car are more compelling than his contrary testimony more than two years later at the suppression hearing. Babadi's decision to impound James' car was not lawful.

As Magistrate Judge Fashing concluded, because the decision to impound James' car was not lawful, the subsequent inventory search of his car also was not lawful. <u>See</u> <u>United States v. Pappas</u>, 735 F.2d 1232, 1234 (10th Cir. 1984)(stating that the inventory search of car that was illegally impounded was also illegal). Thus, all the evidence seized pursuant to that search, including the baggie full of suspected narcotics, the cut-off straw, and the firearm, were "fruit of the poisonous tree," and the Court will suppress that evidence. <u>See</u> <u>United States v. Pappas</u>, 735

F.2d at 1234 (quoting <u>Wong Sun v. United States</u>, 371 U.S. 471, 488 (1963)). But for the illegal search, Babadi would not have found any of these items. Moreover, the United States does not object to this aspect of the PFRD. The Court will adopt, therefore, Magistrate Judge Fashing's recommendation that the Court suppress the evidence that Babadi seized pursuant to Babadi's unlawful inventory search.

### C.    THE MIRANDA WARNINGS WERE ADEQUATE.

Neither party objects to Magistrate Judge Fashing's conclusion that the Miranda warnings given to James were adequate. Having thoroughly reviewed the record de novo, the Court finds that Magistrate Judge Fashing's analysis is correct. The Court will adopt the PFRD with respect to this issue.

In conclusion, although Babadi lawfully stopped James, the United States did not prove that standardized procedures guided Babadi's decision to impound James' vehicle. The Court further concludes that a reasonable and legitimate, non-pretextual community-caretaking rationale justifies Babadi's decision to impound James' vehicle, because Babadi decided to tow the car solely so that he could search it. The impoundment and inventory search therefore violated James' Fourth Amendment rights, and, accordingly, the Court will suppress the evidence derived from the search. Furthermore, although Babadi properly advised James of James' Miranda rights when Babadi detained him, the statements that James made after he was advised of his rights were the fruit of the illegal inventory search, and the Court, therefore, will also suppress James' statements.

**IT IS ORDERED** that: (i) the Defendant Derek James' Objection to Proposed Findings, filed May 29, 2019 (Doc. 36), is overruled; (ii) the Plaintiff United States' Objections to the Magistrate Judge's Proposed Findings and Recommended Disposition (Doc. 29), filed May 29,

2019 (Doc. 37), are overruled; (iii) the Magistrate Judge's Proposed Findings and Recommended Disposition, filed May 15, 2019 (Doc. 29), is adopted; and (iv) James' Motion to Suppress Tangible Evidence and Statements, filed February 25, 2019 (Doc. 16), is granted.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

John C. Anderson
   United States Attorney
Samuel A. Hurtado
   Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

     *Attorneys for the Plaintiff*

Stephen P. McCue
   Federal Public Defender
Alejandro Benito Fernandez
   Assistant Federal Public Defender
Federal Public Defender's Office
Albuquerque, New Mexico

     *Attorneys for the Defendant*